SARAH A. HEWITT et al., trustees under the last will and testament of Abram S. Hewitt, deceased,

*v.*

AMY H. GREEN et al.

[Decided June 19th, 1910.]

1. The court, in determining the intention of testator and the legality or illegality thereof, should consider the circumstances he had in view when he made his will and the conditions existing at the time of his death.

2. The court, in discovering the actual intention of testator and in applying the rule presuming a legal rather than an illegal intent, must consider the express provision which the testator made for a situation which he contemplated as possible or perhaps probable at the time of his death.

3. The rule that where two constructions of a will are possible, and one construction makes the will illegal, while the other makes it legal, the latter must be chosen, applies only where the testator's meaning is doubtful, and, where it is reasonably plain that testator's scheme is illegal, the court will not resort to a fanciful construction to uphold the will.

4. Where testator, drawing his own will, was unfamiliar with the legal limitations on trusts of the kind which he undertook to create, or where he knowingly disregarded those limitations in one provision of the will, the court ought not to impute to him an intention to keep within such limitations in another provision of the will.

5. The phrase "surviving grandchild," when used in a testamentary gift to grandchildren, includes any grandchild who may at the time of the death of testator be *en ventre sa mere.*

6. The court, in applying the rule of construction which gives to technical terms in wills their technical meaning unless they are shown to have been used in a different sense, must consider the fact that testator, who wrote his own will, was not a trained lawyer, but had in his early life studied law and had learned technical terms which he would be extremely liable to use inaccurately.

7. Testator created a trust to pay annuities during the lives of persons named and an annuity to a person named until he arrived at the age of twenty-five years, and provided that the remainder of the income of the fund should be accumulated for the benefit of such of his grandchildren as might survive him or be born after his death, and declared that, when each grandchild should arrive at the age of twenty-one, the interest on his share should be paid to him, until the youngest child should reach the age of twenty-five, when the principal of the fund should be distributed among the grandchildren then living, provided that, if any of the grandchildren prior to such distribution should have died leaving issue, the share of such grandchild should be paid to such issue, &c. Testator at the execution of the will was nearing old age, and the grandchildren living were infants of tender age. He provided for equality between his children.—*Held,* that the trust created in favor of the grandchildren included the grandchildren born after testator's death, and hence was violative of the common-law rule against perpetuities in force in New Jersey where testator died, and the rule against perpetuities as embodied in the statutes of New York, where testator resided at the time of the execution of the will.

8. Where two constructions of a will are possible, that construction should be chosen which fits a possible situation liable to occur after testator's death, and which he may justly be presumed to have contemplated, and with reference to the possibility of which he may be presumed to have framed his will.

9. As to whether a testamentary trust creates a perpetuity depends on conditions and possibilities existing at testator's death, and a trust which would be void if testator died immediately after the execution of his will may become valid where he lives until the conditions change.

10. The law which determines whether a testamentary trust violates the rule against perpetuities is the law of the domicile of the testator at the time of his death, and a will which was void in New York when made by a testator domiciled there may become valid where he subsequently dies domiciled in another state.

11. The intentions of a testator—that is, the meaning of the language employed by him—must be determined with the aid of the circumstances surrounding him at the time of the execution of the will, though he subsequently removed to another state, where he died.

12. Where a testamentary gift of income of a trust fund to testator's grandchildren was a mere incident to the tying up of the trust fund for

their benefit until the youngest member of the class reached a specified age, thereby violating the rule against perpetuities, the incidental gift was also void.

13. Testator created a fund to pay annuities to four persons named during their respective lives and to one person named until he attained the age of twenty-five, and provided that the remainder of the income should be accumulated for the benefit of such of his grandchildren as might survive him or be born after his death, and provided that when each grandchild should reach twenty-one the interest on his share of the fund should be paid to him until the youngest grandchild should reach the age of twenty-five, when the principal of the fund should be distributed among the grandchildren, subject to the right of any of the annuitants then living, and provided that, if any grandchild died prior to such distribution leaving issue, his share should be paid to such issue, &c.—*Held,* that the invalidity of the trust in favor of the grandchildren did not affect the trust in favor of the annuitants because the trusts were independent of each other.

14. The court has power to make a division of a single trust fund which has been created for two independent objects, one valid and the other invalid, so as to reduce the fund to such amount as is required for the accomplishment of the legal object—the amount the testator would presumably have fixed in case he had known how much of the contemplated trust scheme would be adjudged void, and, where the illegal and legal objects are to be accomplished successively, the whole income of the trust fund will be appropriated first to the accomplishment of the legal object, and will then be terminated, and the fund disposed of on the theory that the whole trust has been executed.

15. A court of equity will not instruct testamentary trustees as to their duty with respect to the payment of the trust estate in their hands until the time for such payment has arrived.

16. Where too large a fund was paid over by the executors to themselves as testamentary trustees for the accomplishment of the trust so far as it was lawful, a resulting trust as to the remainder of the trust fund would be implied in favor of the executors or residuary legatees.

---

Bill for construction of will and instructions to trustees. On final hearing on pleadings and proofs.

*Mr. Albert C. Wall,* for the complainants.

*Mr. John W. Harding,* for the infant defendants.

STEVENSON, V. C.

The suit is for the construction of the will of Abram S. Hewitt, and for instructions to the complainants as trustees

under that will. The will was made on December 31st, 1896, and the testator died on January 18th, 1903.

The following is the portion of the will the meaning and legal effect of which are brought in question:

"*Third.* I hereby give and bequeath to my Executors One hundred thousand dollars of the Prior Lien Gold Five per cent. bonds of the New York and Greenwood Lake Railway Company, or in case they shall have been disposed of before my decease, in lieu thereof, the sum of One hundred thousand dollars in other good securities, belonging to my Estate, or wholly or partly in cash as may, in the opinion of my Executors, be deemed more convenient in trust nevertheless as to the said sum of One hundred thousand dollars, in bonds or in cash, to keep the same invested so as to produce an annual income, out of which to pay the following annuities.

"A. To my niece, Mrs. Annie C. H. White, now residing at 185 Carlton Street, Toronto, Ontario, the sum of six hundred dollars annually, to be paid to her quarterly during her natural life.

"B. To my niece, Mrs. Sarah C. Cowan, the only surviving daughter of my sister, Mrs. Samuel D. Southard, the sum of Six hundred dollars annually, to be paid to her quarterly during her natural life.

"C. To my grandnephew, Griswold Vorhees, the son of my niece, Mary Vorhees, now deceased, the sum of Five hundred dollars per annum for his education and support until he arrives at the age of twenty-five years, when the said annuity shall cease.

"D. To my nephew, Abram Hewitt Southard, an annuity of Five hundred dollars, to be paid quarterly, during his natural life.

"E. To Mrs. Sarah Robson, daughter of my brother Thomas Hewitt, an annuity of Three hundred dollars, to be paid quarterly for and during her natural life.

"F. The remainder of the income of the said trust fund is to be accumulated for the benefit of such of my grandchildren as may survive me or be born after my decease; but when each grandchild shall arrive at the age of twenty-one years the interest on his share of the said fund is to be paid to him in cash until the youngest grandchild shall reach the age of twenty-five years, when the principal of the said fund of One hundred thousand dollars shall be distributed among my grandchildren, then living, share and share alike, provided however that if any of the annuitants heretofore specified shall then be living, an amount sufficient to provide for the payment of the annuity to such beneficiary or beneficiaries shall be reserved from the principal of the said trust fund until the death of the said annuitant or annuitants, when the same shall be distributed among my grandchildren, as hereinbefore provided, and if any one of my grandchildren, prior to such distribution, shall have died, leaving issue, the share of such grandchild shall be paid to such issue, and provided further that if in the judgment of my said Executors or a majority of them at the time of such distribution it shall be more to the interest of any beneficiary of the trust hereby created that the share of such beneficiary shall not be paid over, but shall continue to be held

in trust, the income only of such share shall be paid to such beneficiary subject however to the right of such beneficiary to dispose of the principal thereof by will."

1. The first question to be decided is whether the trust contained in paragraph F above set forth, so far as it undertakes to provide for the holding, accumulation and distribution of a fund for the benefit of the testator's grandchildren, is valid or void under the perpetuity rule.

In case this trust for the grandchildren is adjudged void, the questions then follow, whether it can be severed from the trust for the payment of the five annuities, and if so, when and how the severance is to be effected.

(1) In endeavoring to determine the precise thing which the testator actually intended to have done, and the legality or illegality thereof, it is of great importance in this case that all the circumstances and conditions which he had in view when he made his will, and also some of the conditions as they existed at the time of his decease, should be exhibited to the court and be carefully considered. The disclosure of these matters which has been made by the proofs seems to be incomplete. We are not told what the age of the testator was, but it is apparent, from the ages of his children, that he was in or near old age when he made his will. The extent of the estate which he left was not proved, although from the argument of counsel and from indications in the will, I think that this court must assume that the trust fund of $100,000 for the benefit of nephews and nieces and grandchildren of the testator was a comparatively small proportion of the estate which he left.

The important facts which the testator contemplated when he made his will on December 31st, 1896, six years before his death, were as follows: He was, as stated, at least at the verge of old age. He had a wife and six children, three sons and three daughters. His oldest daughter was nearly forty-two years of age, was married and had two children apparently aged about one and three years, respectively. His next child, a daughter, was unmarried and aged about thirty-eight years. His third child, a son, was about thirty-four years of age. Whether he was married or had issue at the time of the death of the testator, we

are not informed, but it appears from the evidence that in 1907 he was married but had no issue. The fourth child, a daughter, apparently unmarried, was about thirty-one years of age. The fifth child, a son, about twenty-eight years of age, was married, and by 1907, had four children, one of whom was fourteen years of age in the summer of 1907, and therefore was over three years old when the will was made, and over nine years of age at the time of the testator's death. The sixth child was a son apparently unmarried and about twenty-six years of age.

While it is difficult with the proofs which have been submitted on the subject to determine precisely what grandchildren the testator had when he made his will and when he died, it seems to be a safe inference that when he made his will he had at least three grandchildren whose ages ranged probably from about one to three years. It is plain that these grandchildren were infants of tender age, and there is no proof that the testator knew them by sight or had any special interest in them. It is a most important and significant fact, I think, that when the testator made his will he must have contemplated a reasonable probability that other grandchildren would be born during his lifetime after he had made his will, and that unless he lived to an extreme old age, there was a possibility not at all remote, and indeed even a probability that grandchildren would be born after his decease. There is no fact connected with this will or the circumstances which surrounded the testator when he made it which suggests that he had any particular testamentary intention favorable to these three infant grandchildren alone, or with others who might be *in esse* at the time of his death. Such an accidental class of grandchildren would naturally be regarded by him as probable forerunners of a more numerous class whose membership would increase from year to year during a very considerable period of time, and might receive accessions long after he could possibly have expected or even hoped that his own life would endure.

The general scheme of the will which is directed exclusively toward the distribution of the testator's estate among the members of his family, includes provisions for the support of his widow, provisions for his children, provisions for his nephews

and nieces, and provisions for his grandchildren.  A fact which stands out most distinctly and which has a direct bearing upon the questions under discussion in this case, is that the testator names no child and no grandchild as the object of his bounty. He naturally names the widow, and he naturally and necessarily names the nephews and nieces to whom annuities are given, but when he comes to his children and his grandchildren, he deals with each set of beneficiaries as a class.  The entire residue of his estate he gives in equal shares to his children who should survive him, and he adds to the residuary clause the following provision:

"And in case anyone of my children now living shall die before my decease leaving children, the share of each child shall be held in trust by my executors for his benefit until the youngest child thereof shall have reached the age of twenty-five years."

In view of the course of the argument, I think we may assume that no child of the testator predeceased him leaving issue who survived the testator.  In discovering the actual intention of the testator, however, and particularly in applying the familiar rule which presumes an intention to do what is legal rather than an intention to do what is illegal, it is worth while to consider carefully this express provision which the testator made for a situation which he contemplated as possible or perhaps probable at the time of his death.  But the feature of this residuary clause to which particular attention is now directed consists in the fact that it disposes of the residue of the estate to the testator's children as a class without naming any one of them, but endeavoring to deal impartially and equally with every member of the class.

Just as the testator contemplated his children as composing a class among whom the residue of his estate was to be distributed equally, so we find that the distribuion of the $100,000 trust fund was to be made to grandchildren equally and impartially without naming any particular grandchild.

It is admitted that the testator was admitted to the bar, presumably in New York or in New Jersey, but never practiced after his early youth, and that he drew this will himself.  When

the will was executed the testator was domiciled in the State of New York, and remained so domiciled for about four years, when he removed to the State of New Jersey, and remained domiciled there until his death.

(2) The argument on behalf of the validity of this trust for the grandchildren naturally is based largely upon the rule that where two constructions of a will are possible and reasonable, and one of these constructions makes the testamentary disposition illegal while the other makes such disposition legal, the latter is to be chosen. This principle, however, seems to me sometimes to have been carried to such an extent as to result in a will being made for the testator which he never intended to make. Where it is reasonably plain what the testator's scheme was, and such scheme is illegal, a court ought not to resort to a fanciful construction and by excluding the illegal intention from consideration find a legal intention which in fact the testator never had. In order to have a situation to which the above mentioned well settled rule of construction is applicable, the testator's meaning must be doubtful without regard to the legality or illegality of one of the two possible meanings. Testators must execute their wills according to law, and must not endeavor to make unlawful testamentary dispositions of their estates or else their testamentary efforts will be abortive. The law undertakes to take care of the disposition of a man's property after his death so far as he does not make a lawful testamentary disposition of it. When by an artificial and technical course of reasoning the invalid gift which the testator intended to make is converted into an entirely different valid gift which the testator did not intend to make, the result is a very gross injustice and a violation of the rights involved in the testamentary disposition of property. It is one thing to deny the right of a testator to make an illegal disposition of his estate, or of a portion of his estate; it is a very different thing after denying that right to distort the abortive illegal gift which the testator meant to make into a legal gift which he did not intend to make.

In my judgment this will presents a case in which the presumption in favor of legality should be applied to the ascertainment of the actual meaning of the testator with great caution.

The inference, it seems to me, is unavoidable from the last clauses of the third paragraph of the will quoted above, and from the last clause of the fourth paragraph, also quoted above, that the testator ignored the perpetuity rule and must have been entirely ignorant of it. The elaborate and closely reasoned argument in favor of the legality of this trust set forth in the briefs of counsel, repeatedly meets the difficulty presented by the discretionary power attempted to be given by the executors to extend the trust by urging that if the perpetuity rule is violated by the provision in question, such provision may be treated as void without affecting the other portions of the will. When we find that a testator apparently was entirely unfamiliar with the legal limitations upon trusts of the kind which he undertook to create in his will, or knowingly disregarded those limitations in one provision of his will, to impute to him an intention to keep within those same limitations in another provision of his will, seems to be reasoning from a fiction.

(3) It seems to me that caution also must be used in this case in attributing to the phraseology which the testator has employed the technical meaning which has been fastened upon the same phraseology in the decisions of courts in other cases. A large part of the ingenious arguments in favor of the validity of this trust consists in the skillful use of decisions construing other wills made by other testators, in other language, under other circumstances. When the necessities of the argument require that a phrase shall not be employed in the strict and technical sense which has been generally imputed to it, another more loose or popular meaning is adopted. The phrase "surviving grandchild," when used in a gift to grandchildren, includes any grandchild who may at the time of the death of the testator be *en ventre sa mere.* It is argued, however, that in this case the phrase "such of my grandchildren as may survive me" includes only grandchildren born before the decease of the testator, while the phrase which immediately follows "or be born after my decease," by the application of the presumption in favor of legality is to be distorted from its apparently plain meaning and limited so as to include only a grandchild or grandchildren *en ventre* at the time of the death of the testator.

In the case of *Hickling* v. *Fair* (*1899*), *A. C. 15, 25,* Lord Herschell expresses the following criticism of the trend of the older decisions in will cases, which, in my judgment, is entirely accurate:

"It is a sound canon of construction applicable to both countries (England and Scotland) that words of art must be interpreted in their technical sense unless the testator has shown that he is using them otherwise. But I think there has been too much tendency in England to go beyond this—to evolve a rigid rule from decided cases, and to apply previous decisions to the interpretation of wills which have subsequently to be construed, instead of endeavoring to ascertain by a study of the particular instrument what was the intention of the testator."

In *Kingsbury* v. *Walter* (*1901*), *A. C. 187, 188,* Lord-Chancellor Halsbury expressed his strong disinclination to lay down abstract propositions in regard to the meaning of terms in wills "which are likely (do what you will in order to apply your observations to the particular will) to be quoted afterwards as applicable to a different will, made by a different person, using different language, under totally different circumstances."

In *Inderwick* v. *Tatchell* (*1903*), *A. C. 120, 122,* Lord Halsbury says: "I cannot help saying that the word 'survivor' is a word which requires a context. Survivor of whom? Survivor when? Those are both categories of thought which must be supplied in order to give the word 'survivor' any meaning at all. It may mean the survivor of the testator; it may mean the survivor at the time of some event contemplated by the will which is being discussed; what it is must be found out by reference to the context."

A striking illustration of the danger of arbitrarily adopting for one will the meaning of phraseology as employed in another will is presented, I think, by the citation of the famous *Thelluson Case* in the brief for the grandchildren in this case. The inquiry here is as to the meaning of certain phraseology as applied to the determination of the objects of the testator's bounty, while in the *Thelluson Case* the phraseology to be construed related not to the objects of the testator's bounty but merely to

the class of persons whose lives measured the duration of the trust.

In applying the rule of construction which gives to technical terms their technical meaning unless they are shown to have been used in a different sense, it should be borne in mind that the testator was not a trained lawyer but had probably in his early life when he studied law, or began the practice of law, learned a great many technical terms which he would be extremely liable afterwards to use inaccurately unless he spent a great deal of time in the study of subjects which during his long and active business life would otherwise to a large extent pass from his mind.

(4) As I read this third paragraph of the will in question I am unable to discover any ground for doubt in regard to the testator's meaning. It seems to me that it is only by a highly technical and artificial course of reasoning largely from fictitious premises, that any difficulty can be discovered in ascertaining the actual meaning of the testator in this trust provision for the benefit of his grandchildren, so far as the duration of the trust and the definition of the beneficiaries are concerned.

The first clause in paragraph F, it seems to me, can bear but one meaning. When the testator uses the phrase "such of my grandchildren as may survive me or be born after my decease," it seems to me he has in mind all those persons who will be or become his grandchildren at any time either before or after his decease. To hold that this testator who was dealing equally and fairly with his children as a class, and was also establishing a trust for the benefit of his grandchildren, arbitrarily drew the line so as to include within the scope of his bounty such grandchildren as might be *in esse* at the time of his death, and exclude the after-born grandchildren, would be in my judgment to impute a capricious intention to this grandfather quite contrary to the whole spirit of the will. When it is considered that the testator must have contemplated that in all probability when years after his decease the distribution of the $100,000 should be made, his grandchildren as a class might be double or treble the number of the grandchildren *in esse* at the time of his decease, and that the testator is not shown to have

had any substantial relations with the grandchildren who were born in his lifetime, or were born at the time he made his will, or that he even had seen them or knew their names, the improbability of such an arbitrary and unequal distribution among the grandchildren, I think, is made evident. It is argued that the testator actually contemplated when he made his will, knowing that he was liable to die at any time, and at most could not live very many years, that this trust for grandchildren should be closed at the date of his death whenever that might occur, so as to include all grandchildren then born and any grandchildren then *en ventre,* and exclude a class of grandchildren whom he must have seen would be very liable to come into existence long after his decease. I am now testing this provision by a situation to which it might be applicable, and which the testator plainly *must have contemplated.* I am not indulging in the dangerous and oftentimes fallacious method of determining the meaning of phraseology which the testator has employed by thinking out all sorts of situations to which the phraseology might become applicable, but which never entered into the testator's mind. If this testator contemplated limiting his trust gift for the benefit of his grandchildren so as to exclude the numerous grandchildren whom he must have contemplated as liable to come into the world more than nine months after his decease, he must have regarded as a possible situation that when he died there would be but one grandchild *in esse* and he *en ventre sa mere* while five or ten other grandchildren might be born within a few years thereafter.

Paragraph F, in my opinion, provides a trust fund for the benefit of all the grandchildren of the testator whensoever they might come into the world. It made provision for all adult members of the third Hewitt generation, perhaps to insure some support for them in case any of the fortunes left to the second generation should be lost. Although it was possible that the trust might terminate within a very brief period after the testator's death, it is plain that the probabilities altogether favored its duration for a very considerable period of time. The testator, as we shall see, did not think out a great many possible situations. His mind was probably accustomed to dealing

with large affairs and taking a wide view. I do not think that there is any construction of this will which can be supported by the least semblance of argument which will not involve necessarily numerous situations which the testator never contemplated, and in respect of which he neither formed or intended to express any testamentary purpose.

In connection with this subject the views of Lord Halsbury in *Higgins* v. *Dawson* *(1902)*, *A. C. 1, 6,* are of value. The lord-chancellor is referring to the practice of construing a will by dealing with different possible situations and extracting "the whole subject matter" which the testator might have had or ought to have had in his mind, and he concludes that this process "is not to construe or to interpret the language which the testator himself has used, but to make a will for him which you think he ought to have made if he had had the whole circumstances present to his mind."

The whole gift of the principal fund to grandchildren in this case is embodied in the direction to distribute the fund to them. The fund at the start is given to the executors in trust and the trust is declared to be "to keep the same invested so as to produce an annual income." The application of a portion of the annual income, which in fact was $2,500 at the time of the testator's death, to the payment of five annuities was then prescribed, and the remainder of the income was directed to be accumulated for the benefit of such of the grandchildren of the testator as should survive him or be born after his decease. When we come to the period which terminates the trust, it seems to me to be beyond all doubt that the class who are to take the fund cannot possibly be determined until the time of distribution. The direction is that when the youngest grandchild shall reach the age of twenty-five years the principal shall be distributed among the grandchildren "then living, share and share alike." No grandchild is to take unless he shall be living at the time when the distribution is made. The testator then provides that if prior to the time of distribution any of his grandchildren "shall have died" leaving issue the share of such grandchild "shall be paid" to such issue. Is it not plain that the testator is standing at the time of the distribution and contemplating the conditions as

they then would be, and is dealing with the possible case of a grandchild who "shall have died?" The testator's language, I think, amounts to this: if at the time of distribution any one of my grandchildren shall have died leaving issue, the share which such grandchild would have taken if he had lived until the distribution, shall be paid to such issue. This provision for the issue of a deceased grandchild is exactly in accord with the provision for distribution to the grandchildren. The only right that any beneficiary gets is under the direction to pay. The phrase "the share of such grandchild" plainly is equivalent to the phrase "the share which such grandchild would have taken." What is in mind is not the ownership of the share by a deceased grandchild, but the payment of that share to the issue of the deceased grandchild. The testator is not regarding a deceased grandchild as owning a share; the testator is contemplating the share which the deceased grandchild would have owned if he had lived to reach the time of distribution so as to receive the payment which the testator is directing to be made.

I feel obliged to find in this third paragraph of the will a clearly expressed intention to have the principal fund of $100,-000 held in trust for distribution to a class of beneficiaries who could not possibly be ascertained until the youngest grandchild of the testator shall reach the age of twenty-five years, and that the testator intended that this youngest grandchild, whose attainment of the age of twenty-five years limits the duration of the trust, might be born more than nine months after his (the testator's) decease—born at any time after the testator's decease. Inasmuch as it is plain, in my opinion, that there is no gift of the principal fund except in the direction to distribute and pay, it follows, according to a well settled rule about which no question has been raised in this case, that the entire gift remains contingent until the happening of the event upon which the payment and distribution are to be made. *Post* v. *Herbert's Executors, 27 N. J. Eq.* (*12 C. E. Gr.*) *544; Hartson* v. *Elden, 50 N. J. Eq.* (*5 Dick.*) *527; Gray Perp.* (*2d ed.*) *197.* The conclusion follows that when the testator died it was possible that the beneficiaries of the trust could not be ascertained until more than twenty-one years and nine months after the decease of all

the grandchildren *in esse* at the time of the testator's death, and that the gift in trust therefore was void under the perpetuity rule.

(5) The argument in favor of a strained construction of this trust, which would confine the beneficiaries to grandchildren surviving the testator, so as to prevent the trust from being obnoxious to the perpetuity rule, which is based upon the ascertainment of the testator's meaning, or supposed meaning, in the provision for the distribution of income to adult grandchildren, seems to me to illustrate the dangerous and oftentimes fallacious method of construction referred to by Lord Halsbury in *Higgins* v. *Dawson, supra.* The object of this whole provision for the grandchildren was to benefit them after they respectively came of age—to provide for them after their infancy and its accompanying liability on the part of their parents for their support should cease. The testator, I think, had before his mind a very considerable period of years during which the trust fund would receive a substantial increase by accumulation. His design, however, being to benefit his adult grandchildren, he did not mean to allow the accumulation to continue so as to prevent such of them as should come of age before the time of distribution from receiving a portion of the fund. As each grandchild, therefore, comes of age he is to begin to receive, and thereafter receive until the time of distribution, the income of what the testator regarded as this grandchild's share, viz., the share of the principal fund which the grandchild would receive if he lived until the time of distribution. Whether the testator thought out the different situations which would exist in case, after his decease, the number of his grandchildren increased by birth or decreased by death, may be a matter of doubt and speculation. I do not think he did. If two constructions of a will are possible no doubt the argument is fair that the construction should be chosen which fits a possible situation liable to occur after the testator's death, and which the testator may justly be presumed to have contemplated, and with reference to the possibility of which he may be presumed to have framed his will. But in fact testators often do not think out all possible situations or oftentimes even the most obvious possible situations liable to occur after their

decease, and to which their wills will become applicable.` The vicious reasoning to be avoided lies in the assumption that a testator must have thought of things which he might have thought of or ought to have thought of, or perhaps would have thought of if he had had an experienced lawyer to do thinking for him and make suggestions to him. Even if we should by what seems to me to be a most violent distortion of the plain meaning of the testator's words, confine the possible beneficiaries of the principal of this trust fund to grandchildren *in esse* at the time of the testator's death, it seems to me that difficulties would yet remain in carrying out the direction that each grandchild should receive the "interest on his share of the said fund" upon arriving at the age of twenty-one years. I shall not pursue this subject further, however, because I think that the argument based on this provision for the payment of interest on the shares to the grandchildren as they come of age, like the argument based on the presumption in favor of a legal, rather than an illegal, intention, cannot be effectual where there is no reasonable doubt as to the testator's meaning. These arguments, no doubt, are founded upon sound principles, which may properly be taken as guides in a doubtful case. These arguments are of no use where there is no reasonable doubt.

It should be observed that the testator's scheme involved the distribution only of the principal sum of $100,000 when the time for distribution should arrive. As each grandchild reached the age of twenty-one years he took the accumulation of interest on what is called his share of the fund, and interest on the same was to be paid to him from year to year, or time to time, in cash, until the time for distribution of "the principal of the said fund of $100,000 should arrive." When the time for distribution should arrive this scheme would leave only principal then in the hands of the trustees. The distribution, strictly speaking, would be a distribution of the principal fund alone, all the accumulated interest and the annual or semi-annual interest on the shares having theretofore been distributed.

(6) There is nothing to show that when the testator made his will he contemplated changing his domicile. I do not understand that counsel for the grandchildren has intended to offer

any argument that the provisions of this will under examination were valid under the law of the State of New York, either at the time when the will was made or at the time of the testator's death. The most pertinent statute of that state is before the court under the stipulation which puts in evidence "the reports of all the cases adjudged by the courts of New York upon the questions presented in this suit."

Since the revision of the statutory law of the State of New York in 1830 that state has had legislation restraining "the suspension of the absolute ownership" of personal property "by any limitation or condition whatever for a longer period than during the continuance and until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition; or if such instrument be a will, for not more than two lives in being at the death of the testator." *Rev. Stat. 1830 p. 761 § 1.* The same statute limits the period during which the income of personal property can be accumulated. *Id. §§ 3, 4, 5.* This New York law provides that the power of alienation is suspended when "there are no persons in being by whom an absolute fee in possession can be conveyed." *Id. p. 762 § 2,* and *p. 718 § 14.*

"The duration of the suspense of a trust of personal property like a trust in real estate must be founded on lives. No term of years, however short, will satisfy the statute." *Underwood* v. *Curtis (1891), 127 N. Y. 523.* The unanimous opinion of the New York court of appeals in this case, delivered through Mr. Justice Parker, indicates, it seems to me, the invalidity under the law of New York of this trust of personal property for the benefit of testator's grandchildren. See *Schetler* v. *Smith, 41 N. Y. 328.*

In New Jersey we have no legislation restricting the power of alienation of real or personal property or limiting trusts for accumulation corresponding with this New York statute. Under our New Jersey law the trust which we are considering must be tested by the perpetuity rule under the common law or what has sometimes been called the rule against remoteness. The greater part of the argument which counsel for the grandchildren has addressed to this court in order to sustain this trust

on the theory that the interests of the beneficiaries were vested at the time of the death of the testator, seems to have no effect whatever to sustain the trust under this New York legislation which limits the suspension of the absolute ownership of personal property and the suspension of the power of alienation, and the creation of trusts for accumulation and reduces the measure from any number of lives in being to two lives in being.

If, as appears to be the case, this trust for the grandchildren was plainly illegal and void under the New York law, the argument based on a presumption that the testator did not intend to establish a trust which would be void under the laws of New Jersey has very little, if any, force. There is not the slightest evidence that when the will was made the testator contemplated that he would be a resident of New Jersey, at the time of his death, and that therefore the legality of his will would be tested by New Jersey law. The validity of a trust like the one under examination depends upon conditions and possibilities as they exist at the time of the testator's death according to a well settled rule. *Siedler* v. *Syms*, *56 N. J. Eq.* (*11 Dick.*) *275; Gray Perp.* § *231.* A trust therefore which would be void, if the testator died immediately after he made his will, may become valid if he lives until conditions change. The law which determines the validity or invalidity of a trust is the law of the testator's domicile at the time of his death. A will therefore which was void in New York when made may become valid if the testator subsequently dies when domiciled in another state. But the intentions of a testator—the meaning of the language which he employs in his will—must be determined with the aid of the circumstances which surrounded the testator when the will was made. In a case like this, no light is thrown on the meaning of words employed by the testator when he made his will by considering the circumstances which surrounded him subsequently when he died.

I am unable to avoid the conclusion that in this case the testator in creating this trust plainly violated the law of the State of New York, no doubt through lack of technical acquaintance with it, and that there can be no presumption recognized which

is not based on pure fiction, that the testator had any intentions whatever with reference to the prohibitions and limitations of the very different law of the State of New Jersey. If the testator had happened after he made his will to become domiciled in California or Texas, there would not seem to be much force in the argument that when he made his will in 1896, while domiciled in the State of New York, he must be presumed to have intended not to make provisions violative of the California or Texas law, unless there was some evidence that he contemplated the possibility of changing his domicile to California or Texas.

This testator according to what seems to me to be the perfectly plain meaning of the language which he employed, undertook to have $100,000 kept in trust for a period which, at the time of his death, *might* exceed the limit imposed by the perpetuity rule as recognized by the law of New Jersey. The trust therefore is void. This is not the first time that an eminent citizen of the State of New York, of great intellectual endowments, of wide knowledge of affairs, and possessed of a large fortune of his own creation, when undertaking to make his will, has neglected to secure the requisite technical assistance which would have prevented him from attempting to establish an illegal trust. See *Tilden Will Case, 130 N. Y. 29.*

(7) It is urged that the trust for the distribution of income to the grandchildren may be saved and established as legal even though the attempted distribution of the principal must be condemned as violative of the perpetuity rule. The limits of this opinion already too wide will not permit the minute discussion of this provision for the distribution of accumulated income and accruing income to adult grandchildren or to consider the various questions in regard to that provision which might be raised. The whole matter may, I think, be disposed of by the proposition that the gift of income to the grandchildren is a mere incident to the tying up of the $100,000 of principal for their benefit when the youngest member of the class has reached the age of twenty-five years. When the main gift falls the incidental gift falls with it.

2. We now come to the questions as to the severance of the unlawful trust for accumulation and distribution to grandchil-

dren from the entirely lawful trust to secure a fund for the payment of the five annuities.

(1) The legal and illegal trusts are independent of each other. It was manifestly convenient for the testator to accomplish his two independent objects by setting apart a single fund. That these two objects were entirely independent of each other in the mind of the testator, as testamentary dispositions of portions of his estate, seems to me quite obvious. The five annuities amounted, when the testator made his will, to $2,500, only two and one-half per cent. on the principal. The two oldest annuitants were respectively fifty-four and forty-four years of age when the will was made, and sixty-one and fifty-one years of age when the testator died. The annuity of $500 to the youngest of these nephews and nieces will expire by limitation in November, 1911, so that if no deaths occur among the five annuitants until that date, the annual annuity charge on the income of the $100,000 will then be reduced to $2,000, or two per cent. on the principal. When we observe that no interest even is made payable to any grandchild until he shall reach the age of twenty-one years, which date cannot be earlier than 1914, it is difficult to believe it possible that the testator could have intended to tie up the sum of $100,000 for the purpose of providing for these annuities aggregating at the start only $2,500, until the last one, amounting to $300 or $600, should be paid, and that the provision of accumulating the excess of income and then distributing the principal among the grandchildren was a mere incident to this general scheme for the benefit of the annuitants.

The gift to the annuitants and the gift to the grandchildren had no relation to each other in the testator's mind except that they could very conveniently be effected through the machinery of a single trust. The benefaction to the annuitants would begin immediately while the provision for the grandchildren would probably become operative only after a period of years during which some of the annuities—perhaps the most or all of them—would expire. The magnitude of the fund put in trust, far beyond any possible requirements of the annuities, shows that the

benefaction to the grandchildren was a distinct object in the testator's mind.

(2) In view of the natural decrease in the annual aggregate amount which would be required to meet the annuities while the first payment of interest to a grandchild could not take place until the summer of 1914, and might not take place for some years later, it would seem that the testator contemplated that the gift to the annuitants might be fully accomplished before any distribution even of interest to any one of the grandchildren would be made.

(3) The period which the trust for the annuitants is to endure, is entirely distinct from the period which the trust for the grandchildren is to endure. As we have heretofore seen, without the slightest reference to the lives of the annuitants or any other lives in being at the time of the testator's death, no distribution to the grandchildren of interest can be made until or after the year 1914, and no distribution of principal can be made until several, probably many, years later. If, when the time for the distribution of principal is to be made, viz., when the youngest grandchild reaches the age of twenty-five years, any annuitants remain alive to be cared for, a special provision is made for securing that result.

(4) The two trusts are absolutely different in their nature. being intended for the benefit of two classes which must have been broadly distinguished in the mind of the testator. The duration prescribed for each of these two trusts ·is entirely independent of the duration prescribed for the other except so far as the time for distribution of a portion of the principal might necessarily be postponed to .the extent necessary for the execution of the trust in favor of the annuitants.

(5) The words of the will, in their natural and ordinary sense, show that the gift to the grandchildren was an independent benefaction having only an incidental connection with the annuities.

The expressly declared object of the trust is not to pay the annuities but "to produce an annual income." The will then provides that "out of" the income the annuities are to be paid, which, as we have seen, plainly could not possibly require even

at the start much more than one-half the net income, and that "the remainder of the income" should be accumulated, and then after a period of years, paid over to the grandchildren. The testator contemplates a remainder of income as a fact. He does not direct that *in case* there should be a remainder it should be accumulated, &c. He knew right well that there must be a large remainder of income in the absence of accidents and misfortunes which testators do not take into account when establishing funds to yield an income, and he made the trust fund largely exceed the requirements of the annuities because he was intending to make a benefaction to his direct descendants through an accumulation of income for their benefit, and this was a testamentary purpose beyond and distinct from the benefaction to the annuitants, the nephews and nieces. The whole principal of this fund and a large portion of the accumulated income were to go to the grandchildren. Only a fractional part of the income went to the annuitants—a part which the testator must have contemplated as a constantly diminishing charge.

(6) The question of the testator's intention, it seems to me, is settled by the express provision that the distribution of the principal when the youngest grandchild should reach the age of twenty-five years, should be made even though one or several or even all the annuitants should then be alive. This provision demonstrates that the testator did not intend that the whole fund of $100,000 should be held in trust until all the annuities should expire. The testator fixes the time when the fund is to be distributed in whole or in part to his grandchildren, and, recognizing that when the time fixed for such distribution should come, one or more of the annuitants might be alive, he expressly provides for dividing the principal so as to have only so much thereof retained in trust as should be necessary to meet the requirements of the annuity or annuities which then should be outstanding. This provision shows distinctly that the governing purpose of the testator was not to have this large fund ($100,000) kept in trust for the benefit of the annuitants without regard to the execution of the trust for the benefit of the grandchildren, which was always in his mind, but to have only so much of the fund kept in trust for the benefit of the annuitants

as might be necessary to yield from year to year the small sums which he directed to be paid to them. In brief, the whole fund of $100,000, and a large accumulation of interest thereof, were put in trust for the accomplishment of an object which this court has found to be unlawful, but a part of the income was appropriated to an entirely lawful object which would be accomplished within a period during which the testator directed that the principal fund, or so much thereof as was necessary, should be held for the accomplishment of such lawful purpose.

My conclusion on this branch of the case is that it is impossible to find in this will an intention on the part of the testator that the entire fund of $100,000 should be held in trust until the survivor of the five annuitants should die, or until the first of the five annuitants should die, or during any other period measured by the life or lives of any person or persons in being at the time of the testator's death. It may be conceded that the tying up of $100,000 during the lifetime of the survivior of the five annuitants would not be violative of the perpetuity rule in New Jersey however the case might be in other jurisdictions. The question is simply whether this testator, a man of large affairs and of great wisdom, must be deemed to have intended to do this thing. In my judgment, his intention is very plain that so far as the annuities are concerned, the principal fund is to be held in trust only for such a period and to such an extent as would be necessary to secure their payment until the last annuity should expire. The further purpose of the testator to have this principal fund held in trust related entirely to the accumulation and distribution for the benefit of his grandchildren which plainly was an absolutely distinct benefaction.

(7) If I am correct in the view above expressed we have a fund of $100,000 put in trust for the accomplishment of two independent objects, one legal and valid, the other illegal and void. The amount of the fund required for the accomplishment of each object is not stated for reasons too obvious to require discussion. The intention of the testator to put more money in trust than would be necessary to provide the annuities is clearly evinced. His intention seems equally plain that enough money is to be at all times retained in trust to provide for whatever

annuity or annuities might be outstanding. Thus we find a general intent to subject the right of the grandchildren to receive shares of interest and afterwards° shares of principal to this prior right of the annuitants to have a fund kept in trust of sufficient amount to make their annual payments secure. The effectuation of this general intent which involves the complete execution of every valid provision of the paragraph of this will under examination in this case, compels the recognition of the principle according to which the trust fund which the testator viewed as a whole should now be divided. Eliminating the invalid element from the paragraph, what we have left seems to be summed up in the direction that so much of the $100,000 should at all times be held in trust as should be necessary to pay these annuities. The unappropriated portion of the $100,000, i. e., the portion attempted to be appropriated to an illegal purpose, therefore falls into the residue of the estate. As the whole trust so far as the grandchildren are concerned falls as illegal, it seems to be in exact accord with the general intention of the testator so far as the annuities are concerned to sustain so much of the trust as is legal, viz., the keeping of such part of the $100,000 in trust as shall be sufficient to yield a net income equal now to $2,500. Whether when the annuities have been reduced to a much smaller aggregate sum a further withdrawal and distribution under the residuary clause will be allowable, is a question not now before the court, and not necessary to be answered in order to guide the trustees with respect to any action which they are now obliged to take.

(8) The authorities, I think, fully sustain the power of the court to make the division of a single trust fund which has been created for two independent objects, one valid and the other invalid, so as to reduce the fund to such amount as is required for the accomplishment of the legal object—the amount which the testator presumably would have fixed in case he had known how much of his contemplated trust scheme would be adjudged void and therefore incapable of execution.

Where the illegal and legal objects are to be accomplished not concurrently but successively—the whole income of the trust fund being appropriated to the accomplishment, first of one

object and then of the other—the dividing of the testator's scheme is easy of accomplishment. The trust is executed for the accomplishment of the lawful object, and then is terminated and the fund goes on the theory that the whole trust has been executed. *Underwood* v. *Curtiss, supra; Culross* v. *Gibbons, 130 N. Y. 447; Denison* v. *Denison, 185 N. Y. 438.*

In *Lew. Trusts (11th Eng. ed. 1904 p. 119)* the principles controlling the divisibility of a trust having a legal and an illegal object are set forth as follows:

"If property be given upon trust to apply part thereof for an unlawful purpose, and to hold or apply the residue for a lawful purpose, then if the amount intended to be applied for the unlawful purpose cannot be so far ascertained as to make it clear that there would be a residue applicable to the lawful purpose, the whole gift will fall; but the mere fact that the amount to be applied for the unlawful purpose has not been expressly stated in the gift, will not make the whole gift void, and the court will, if it be practicable, ascertain the amount which would have satisfied the unlawful purpose and thus uphold the gift."

It is manifest that no distinction can be drawn between the ascertainment, when practicable, of the amount which would have satisfied the unlawful purpose in order to fix the amount of the lawful gift, and the ascertainment of the amount necessary for the satisfaction of the lawful purpose in order to fix the amount which the testator devoted to an unlawful purpose, and which therefore must be held to pass under a residuary clause, if any, or otherwise as in case of intestacy.

The English cases cited by Mr. Lewin (*p. 119, notes b* and *c*) seem to sustain the doctrine stated. The case of a charity for which Mr. Lewin cites authorities to support a special rule need not in this case be considered.

These English cases show that in order to divide an entire trust fund into two parts, and thereby fix the respective amounts which the testator presumably intended to devote to two objects, one of which must be condemned as illegal, the court will enter upon an inquiry involving estimates and valuations for which there can be only somewhat uncertain measures. In *Vaughn* v. *Thomas, 33 Ch. Div. 187,* the sum of £500 was given to trustees upon trust to apply the residue of the income (which in fact amounted to the entire income) to the keeping in repair of a

24

tomb and the keeping in repair of the parish churchyard. The first object was held not to be charitable, and that the gift as to that object failed. The decree therefore provided that there should be an inquiry to determine the amount of the fund required to yield an income sufficient to keep the tomb in repair, and that the remainder of the fund should be continued in trust for the purpose of keeping the churchyard in repair in accordance with the valid portion of the testator's direction.

In *Hoare* v. *Osborne, L. R. 1 Eq. 585,* where the income of a trust fund was made applicable to keeping the monument in repair, the surplus being applied to keeping the chancel of a church in repair, Vice-Chancellor Kindersley held (at *p. 588*) :

"The cases show that where a single fund is given for several objects of this nature, and one of them is bad, the principle on which the court acts is that if it can be ascertained what are the proper proportions to be attributed to the several objects, it directs an inquiry on the subject, but if from the nature of the gift it appears impracticable to fix the proportions, the court divides the fund equally between the different objects; and I think the latter is the course I must adopt in this case, as I feel assured that no correct conclusion could be arrived at on an inquiry. One-third of the fund attributable to the gift for the repair of the vault which is void falls into the residue."

It is unnecessary to consider further the English cases which support the doctrine of the divisibility of a trust fund like the one in question, or to consider how far in some respects and in regard to some matters these cases are in conflict. All these cases, or at any rate all of them which now should be considered authoritative, support the view, it seems to me beyond all question, that in a case like this, where the ascertainment of the amount of the fund necessary to provide certain annuities is easy of calculation and practically capable of absolute determination, the court will do what presumably the testator would have done if he had thought there was any doubt of the validity of both objects of the trust, viz., divide the fund. This is not making a will for the testator to fit a situation which he did not think of; it is carrying out the plainly expressed donative purposes of the testator as far as the law will permit. What the court does for

the testator is merely to adjust the machinery for effecting the disposition of the testator's estate which under the law of the land he has actually made through the valid trust which he created, and through the residuary clause of his will. When a reasonably definite ascertainment of the two amounts which the testator devoted to two independent objects but left united in one fund, is impossible according to the donative purposes expressed in his will, whether both gifts fail or the whole fund goes to one object when the same is charitable, or there should be an equal division of the fund, are questions which are not presented to the consideration of the court in this case.

3. The last matter to be considered is whether these trustees, the complainants, are at the present time confronted with the duty of pursuing a course of conduct about which they are in doubt, and concerning which they require instructions from this court. The general rule is well settled that a court of equity will not instruct trustees in regard to their duty with respect to the payment or transfer of the trust estate in their hands, until the time for such payment and transfer has arrived. *Ogden* v. *McLane (1907), 73 N. J. Eq. (3 Buch.) 159,* and cases cited on *pp. 161, 162.* The case at bar illustrates the propriety of keeping this rule in view. The court is asked to adjudicate upon the rights of infants to a fund of $100,000 and the interest thereon years before any distribution of the fund to the infants would be necessary, and of course before these infants are able to attend for themselves to the presentation and argument of their cause.

It seems to me, however, that these trustees require directions in regard to the discharge of duties which they ought to proceed at once to perform, and which they cannot safely perform without such directions. If the bill had been filed by the complainants as executors, requesting instructions whether or not to pay over to themselves, as trustees, the whole of the $100,000 fund, their right to receive instructions would perhaps have been more plain. The bill is filed by the complainants as trustees, and it alleges that as trustees they have received from the executors, *i. e.,* from themselves as executors, the entire $100,000 fund. The distinction between the complainants as executors and as trustees for the purposes of this case is, I think, purely technical

and unimportant. If too large a fund has been paid over to these trustees for the accomplishment of the lawful trust to which a portion of the income is to be applied, a resulting trust as to the remainder of the fund may, if necessary, be erected, and it is immaterial whether such trust is in favor of the executors or in favor of the residuary legatees. A duty in either case rests upon these trustees to surrender that portion of the fund which we may assume the executors unnecessarily and unlawfully paid over to them, and the rightful takers of this fund are the residuary legatees, to whom it is the present duty of the trustees, directly or through the executors, to pay the same under the construction of the will which hereinbefore has been made.

The decree will provide for the ascertainment of the amount reasonably necessary to be kept in trust to insure the payment of the annuities in accordance with the clearly expressed intention of the testator, and the trustees will be directed to surrender the remainder of the fund. If necessary the bill may be amended so as to present the cause on behalf of the complainants as executors as well as trustees. Whether the complainants, as executors, should resume possession of the portion of the fund which they, as trustees, are adjudged to have no right to hold, or whether payment of such portion should be made by the trustees to the residuary legatees, are questions involving some conditions and some technicalities which have not been brought to the attention of the court and have not been the subject of argument. The exact form of the decree in regard to these matters, including the method by which the fund should be divided, may be determined upon settlement of the decree.